## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

MARY LORENZO,                                   Case No. 6:09-bk-004179-ABB
                                                Chapter 13
    Debtor.

_____/

ROBERT A. KAPLUS and
HOME BUYERS "R" US, LLC,

    Plaintiffs,                             Adv. Pro. No. 6:09-ap-00832-ABB

vs.

MARY LORENZO,

    Defendant.

_____/

## MEMORANDUM OPINION AND ORDER

This matter came before the Court on the Complaint to Determine Non-Dischargeability of Debts (Doc. No. 1) ("Complaint") filed by Robert A. Kaplus ("Kaplus") and Home Buyers "R" Us, LLC ("HBRU") (collectively, "Plaintiffs") against the Defendant and Debtor Mary Lorenzo ("Debtor"). Plaintiffs request debts stemming from a loan and several monetary advances made to Debtor be deemed nondischargeable pursuant to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(4). Debtor filed a Counterclaim (Doc. No. 5) seeking an award of reasonable attorneys' fees and costs.

The final evidentiary hearing was commenced and concluded on May 12, 2010 at which the parties appeared, represented by counsel. The parties filed post-hearing briefs and affidavits of fees and costs incurred in Bankruptcy Court and Florida State Court litigation. Plaintiffs filed an Affidavit (Doc. No. 28) requesting an award of fees and

costs of $108,386.50. Debtor filed an Affidavit (Doc. No. 30) requesting an award of fees and costs of $47,046.36.

The debt relating to the March 15, 2006 $67,000.00 loan and the advances of approximately $332,211.61 are dischargeable. Plaintiff's request for an award of attorneys' fees and costs and interest is due to be denied. Debtor is entitled to an award of reasonable attorneys' fees and costs.

The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

## **FINDINGS OF FACT**

### *Background*

Kaplus has been a licensed real estate broker for more than twenty-five years and has been involved for several years as a real estate investor. Debtor has been a licensed real estate agent and broker for more than ten years. She and Kaplus met when she was about seventeen. Debtor marketed and sold timeshares for a company Kaplus owned. Kaplus married one of the Debtor's high school friends.

Debtor and Kaplus interacted on and off over the years. They reconnected in February 2006 when they encountered each other near their respective homes in the Orlando, Florida area. The Debtor's real estate business was doing well at the time of their encounter. Her fortunes changed after real estate values dramatically declined later that year. Debtor filed a Chapter 13 bankruptcy case on March 31, 2009.

2

Plaintiffs instituted this adversary proceeding against Debtor asserting debts totaling approximately $399,211.61 owed to them by Debtor are nondischargeable.[1] The debts arise from a loan made by Kaplus to Debtor for $67,000.00 and several advances from HBRU to Debtor totaling $332,211.61. Plaintiffs contend Debtor fraudulently induced them to make the loans and advances, and obtained the loan and the advances through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

The Court has struggled to decipher the facts of this matter. The parties presented incomplete and sometimes conflicting accounts of their business dealings. Their dealings were largely undocumented and based upon oral communications.

### BTB Loan

Debtor mentioned a real estate investment opportunity she learned about from her friend Don Crupi, a/k/a Don Crupie ("Crupi"), to Kaplus during their February 2006 encounter. The investment involved an entity named BTB Consulting ("BTB"). Debtor told Kaplus BTB operated a program whereby investors purchased houses for a low price through BTB, and BTB would arrange to have pre-approved buyers subsequently purchase those houses for a higher price. A "guaranteed" buyer was supposed to buy the houses from the investor within a few weeks of the investor closing on the house. BTB would collect a consulting fee for arranging the investment. Debtor had three friends who had profited from this arrangement, and she wanted to participate.

---

[1] The debt amounts contained in the Plaintiffs' Complaint differ from those contained in the claims Plaintiffs filed in the Debtor's main case. HBRU filed a general unsecured claim, Claim No. 22-1, for $367,638.05 and Kaplus filed a general unsecured claim, Claim No. 23-1, for $102,292.36. The Debtor objected to the claims and the objections are pending in the main case.

Debtor told Kaplus she was interested in investing through the BTB program but did not have the capital for the initial investment. Debtor was in the process of buying several investment condominiums and did not have sufficient capital to invest in the BTB venture. Debtor asked Kaplus if he was interested in creating a partnership to invest in the BTB venture, which she represented as a "no-brainer" investment opportunity. Kaplus was aware the BTB idea was presented to Debtor by Crupi.

Kaplus was on vacation in Colorado from March 11 through March 18, 2006. Debtor made several calls to Kaplus during his vacation to encourage him to join her in the BTB deal. She faxed him a variety of documents prepared by BTB.[2] Several of these documents stated BTB would guarantee purchasers, for each house at an agreed "Resale price," within thirty days of closing.[3] The agreed resale price for each of the houses was $734,000.00, for a total resale price of $2,202,000.00.[4] The three houses would be purchased by Debtor and Kaplus for a total cost of $1,726,500.00.[5] BTB would charge a total of $120,000.00 in consulting fees and closing costs of $66,060.00.[6]

Kaplus did not execute any of the faxed documents. Debtor informed Kaplus BTB needed to be paid the $67,000.00 by 4:00 p.m. on Monday, March 13, 2006.[7] The deal was later extended for a few days. Kaplus wired $67,000.00 to Real Estate Investors Today, a company Debtor controlled, on March 15, 2006.[8] Kaplus' wiring instructions to

---

[2] Ps' Ex. 2, 3, 4, 5, 6.
[3] Ps' Ex. 3, 4.
[4] Ps' Ex. 5.
[5] Ps' Ex. 1.
[6] Id.
[7] Id. at ¶ 2.
[8] Ps' Ex. 7.

4

his bank indicated the funds were to be an "investment loan" ("the BTB Loan").[9] Debtor, upon receiving the wire from Kaplus, invested the $67,000.00 with BTB.

Kaplus, subsequent to BTB's receipt of the $67,000.00, met with Debtor and Crupi on March 20, 2006 to discuss the BTB venture. Kaplus asked Crupi a number of questions about BTB during this meeting. Kaplus thought the BTB deal "looked like a scam" and demanded Debtor return the $67,000.00. Debtor agreed to refund the monies. She orally promised to return the $67,000.00 to Kaplus in two weeks. She believed she could promptly refund the monies to Kaplus by asking BTB to return the funds.

Debtor asked BTB to refund the $67,000.00 to her, but BTB did not refund the funds. Insufficient and contradictory information was presented regarding how the $67,000.00 investment was utilized by BTB.

Debtor intended to refund Kaplus the $67,000.00 through other means: (i) through the BTB investment opportunity; or (ii) alternatively, through the sale of her residential condominium. She communicated her intentions to Kaplus.

Debtor believed she would quickly earn a significant profit in the BTB investment venture and could refund Kaplus the $67,000.00 from such profit. She went forward with the BTB investment and purchased two houses in Kissimmee, Florida ("the BTB Houses"). Debtor financed the purchases by personally mortgaging the BTB Houses.

Debtor did not refund the $67,000.00 to Kaplus. Debtor's BTB venture was unsuccessful; the BTB Houses were ultimately foreclosed upon. Debtor sold her residential condominium, but the details regarding the sale were not presented.

---

[9] Id.

*Lake County Venture*

Debtor and Kaplus discussed another proposed business venture in late March 2006. Debtor and Kaplus would create a partnership to purchase low-cost houses, renovate them, and sell them for a profit; a process commonly known as "flipping." Debtor detailed this plan in a March 28, 2006 email to Kaplus referencing prior discussions.[10]

Kaplus would be responsible for providing the necessary capital to buy, renovate, and maintain the houses; Debtor would be responsible for locating the houses, negotiating the purchases, renovating the houses, and selling the houses.[11] Debtor told Kaplus she had many contacts she could draw upon to do renovation work and had attended several seminars on renovating houses. The parties intended to renovate the houses within thirty days of closing, and sell them within ninety days of closing.

Debtor and Kaplus decided to go into business ("the Lake County Venture"). Debtor sent a May 28, 2006 email to Kaplus containing a detailed business plan.[12] Debtor and Kaplus would form a limited liability company, funded by Kaplus, which Debtor would run on a daily basis.[13] They would purchase three to five homes per month over twenty four months, netting a profit of $2,000,000.00 which was to be shared by Debtor and Kaplus.[14] Debtor and Kaplus would each draw a salary of $10,000.00 per month until September 2006 when their salaries would increase to $18,000.00 per month.[15]

---

[10] Id.
[11] Id.
[12] Ps' Ex. 11.
[13] Id.
[14] Id.
[15] Id.

Debtor and Kaplus decided to use HBRU to operate the venture. HBRU is a company Kaplus had previously formed and operated. Kaplus changed the name of the existing company to HBRU.

The parties originally agreed Kaplus would pay cash for the houses,[16] but Kaplus later decided to finance the purchases by the Debtor personally mortgaging the properties. Kaplus told Debtor this would allow them to purchase more properties without expending additional funds. Debtor would later transfer the title of all of the houses to HBRU and HBRU would make the mortgage payments. The parties agreed HBRU would pay Debtor a regular salary of $10,000.00 per month, in order for her to be able to devote more time and attention to HBRU's activities. HBRU paid Debtor a total of $40,000.00 for the months of July, August, September, and October 2006.[17]

Debtor's July 8, 2006 email to Kaplus stated she agreed to repay Kaplus the $67,000.00 when her residential condominium sold, after Kaplus insisted on a written repayment agreement. The email stated the condominium should be sold on or before October 1, 2006.[18] Kaplus contends he went forward with the Lake County Venture in reliance on the July 8, 2006 email.

Debtor performed due diligence on the Lake County Houses before purchase; Kaplus did not inspect the houses before purchase. Debtor visited the houses to note their condition, retained a home inspector, and completed analyses of the houses to ascertain the feasibility of profitable renovation.[19]

---

[16] Ps' Ex. 10.
[17] Ps' Ex. 16, 18, 19, 20.
[18] Id.
[19] Ps' Ex. 42, 47, 50, 53, 67.

Debtor purchased five houses in Lake County, Florida, ("the Lake County Houses"), financed by the Debtor personally mortgaging the properties. Debtor purchased two of the houses in June, one in July, and two in September 2006.[20]

Debtor went to work performing renovations after purchasing the five houses. She hired her brothers and father to do some of the work and paid for some of the repairs, supplies and other purchases on her personal American Express credit card.[21] Debtor would submit her American Express credit card statements to Adel Zira-Diaz ("Zira"), the HBRU accountant, for reimbursement.[22] Zira reimbursed purchases documented with valid receipts. HBRU paid the mortgage payments[23] and some of the costs associated with purchasing, maintaining, and renovating the Lake County Houses.[24]

HBRU ceased mortgage payments, payments to contractors, and reimbursements to Debtor in December 2006 pursuant to Kaplus' direction.

### Nominee Agreement

The parties communicated primarily orally and through email. The Nominee Agreement, which Kaplus, HBRU, and Debtor executed on June 30, 2006, is the sole formal written agreement presented by the parties. Kaplus executed the Nominee Agreement individually and as the Manager of HBRU.

The Nominee Agreement provides, in part:

(1) it is supported by "good and valuable consideration";

(2) Debtor and Kaplus each own fifty percent of HBRU;

---

[20] Ps' Ex. 33, 35, 37, 41, 44, 48, 49.
[21] Ps' Ex. 23.
[22] Ps' Ex. 17, 18, 19, 20, 22, 24, 29.
[23] Ps' Ex. 20, 21, 22, 24, 26, 29.
[24] Ps' Ex. 14, 16, 17, 18, 19, 20, 21, 22, 24, 25, 26, 29, 30, 72, 73, 78, 79, 80, 81.

(3) the parties anticipated entering into an operating agreement within sixty days to govern HBRU;

(4) Debtor and Kaplus formed HBRU to purchase, renovate, and resell houses located at 1017 Cypress Street, Leesburg, Florida 34748 and 2630 Southland Road, Mount Dora, Florida 32757, among others;

(5) Debtor, even though she was named on the deeds of both houses located at 1017 Cypress Street and 2630 Southland Road, she acquired both houses on behalf of HBRU with funds contributed by Kaplus;

(6) title to the 1017 Cypress Street and 2630 Southland Road houses would be held in Debtor's individual name;

(7) Debtor would acquire properties, arrange all financing, enter into contracts, and complete all other arrangements needed to effectuate the purchase of houses;

(8) Debtor and Kaplus were authorized to conduct transactions on behalf of HBRU;

(9) Greenspoon Marder, P.A. drafted the Nominee Agreement on behalf of Kaplus and HBRU.[25]

The Nominee Agreement provides for the recovery of reasonable attorney's fees and costs at Paragraph 15:

> If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, expenses, costs of appeal and necessary disbursements in addition to any other relief to which such prevailing party may be entitled.

Debtor asserts the Nominee Agreement is binding on the parties. Kaplus asserts the Nominee Agreement does not constitute a binding contract because the parties did not intend for it to be binding and they intended for an operating agreement to govern their relationship. Kaplus' position is contrary to the parties' course of conduct, his actions in the Florida State Court and this Court, and the plain, unambiguous language of the Nominee Agreement.

---

[25] Id.

9

The Nominee Agreement memorialized the parties' on-going pattern of conduct which they continued, post-execution, pursuant to its terms. Kaplus instituted a Florida State Court lawsuit against Debtor prepetition in which he asserted a breach of contract cause of action against her based upon the Nominee Agreement. Plaintiff's Complaint filed in this adversary proceeding is based in part on the Nominee Agreement.

The Nominee Agreement recites in plain, unambiguous language it is binding on the parties. The Nominee Agreement sets forth:

(i)     it "shall continue until all Properties of the Company [HBRU] acquired by Mary [Debtor] as nominee pursuant to this Agreement are sold";

(ii)    upon execution it constitutes "one Agreement binding on all of the parties"; and

(iii)   "shall be binding upon, inure to the benefit of, and be enforceable by or against the heirs, successors, legal representatives and assigns of the parties hereto . . ."[26]

The Nominee Agreement sets forth the parties were to enter into an Operating Agreement "to govern the management and operation" of HBRU, but the effectiveness or enforceability of the Nominee Agreement was not contingent upon the creation of such Operating Agreement.[27] The Nominee Agreement has no conditions precedent.

The parties, as established by the plain, unambiguous language of the Nominee Agreement and their actions, intended for the Nomine Agreement to be binding. The Nominee Agreement is a valid, enforceable contract.

---

[26] Ps' Ex. 12.

[27] Id. at ¶6.

### *Dischargeability Analysis*

The Complaint arises under causes of action pursuant to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(4). Plaintiffs have the burden to establish by a preponderance of the evidence Debtor made a false statement with the intent to deceive them, and they justifiably relied upon such falsehood resulting in damages suffered by Plaintiffs. Plaintiffs have the burden to establish by a preponderance of the evidence the Debtor incurred debts to Plaintiffs through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

Plaintiffs did not present credible evidence the Debtor engaged in acts of misappropriation, embezzlement, larceny, fraud or defalcation in incurring the debts owed to Plaintiffs. Debtor did not engage in these acts in incurring the debts owed to Plaintiffs. Any fiduciary duty the Debtor may have owed the Plaintiffs did not meet the standard for a fiduciary duty, pursuant to 11 U.S.C. Section 524(a)(4).

Debtor did not make any false representations to Plaintiffs to induce the BTB Loan or the Lake County Venture advances. Debtor based her representations regarding the BTB deal on representations made to her by Crupi and BTB, which she believed to be true. These representations made to Debtor and relayed to Kaplus included the representation each BTB house would sell within thirty days of closing, resulting in a net profit of between $250,000.00 and $350,000.00.

Debtor based her representations regarding the Lake County Venture on what she believed to be true. Her actions were based on her understanding of market conditions, value of houses purchased, time needed to renovate, time needed to sell, and the ultimate market value of the renovated houses.

11

Debtor relied on the facts, circumstances, and representations she believed to be true, when she personally invested, through the mortgage debts, in the BTB and Lake County Ventures.

Plaintiffs did not justifiably rely on Debtor's representations regarding the BTB or Lake County Ventures. Kaplus failed to conduct due diligence before making the BTB Loan or advancing the Lake County Venture monies. Kaplus went forward with the Lake County Venture despite his earlier belief the BTB opportunity "looked like a scam," and Debtor's failure to refund the $67,000.00.

The Nominee Agreement outlining the parties' business relationship and the purchases of the first two Lake County Houses were consummated in June 2006. Plaintiffs did not rely on Debtor's July 8, 2006 representation she would repay the $67,000.00 in deciding whether to begin participation in, and monetary advances for, the Lake County Venture.

Debtor was not as sophisticated as Kaplus. He is a sophisticated and shrewd investor who maintained control of HBRU and the Lake County Venture during its creation and the period funds were advanced. The Nominee Agreement was drafted at the direction of Kaplus for his benefit. Kaplus demonstrated his control of HBRU and the Lake County Venture when he decided the house purchases would be funded through Debtor's mortgages, rather than his cash advances, and when he caused HBRU to cease funding the Venture in December 2006, leaving Debtor personally liable for the mortgage payments on the Lake County Houses, in a declining market.

Debtor's testimony regarding her understandings, interactions, agreements, and representations was credible. Kaplus' testimony regarding the same was evasive and not credible.

### Dischargeability Conclusion

Kaplus has not established by a preponderance of the evidence: (1) the Debtor made a false statement with the intent to deceive Kaplus upon which Kaplus justifiably relied on in wiring Debtor the $67,000.00 BTB Loan; or (2) the Debtor incurred the $67,000.00 BTB Loan debt through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The indebtedness owed by Debtor to Kaplus relating to the $67,000.00 loan is dischargeable and due to be discharged.

Plaintiffs have not established by a preponderance of the evidence: (1) the Debtor made a false statement with the intent to deceive Plaintiffs upon which Plaintiffs justifiably relied on to make the advances relating to the Lake County Venture; or (2) the Debtor incurred the indebtedness relating to the Lake County Venture through fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The indebtedness of approximately $332,211.61 owed by Debtor to Plaintiffs is dischargeable and due to be discharged.

Any and all indebtedness owed by Debtor to Plaintiffs relating to the BTB Loan and Lake County Venture is dischargeable and is due to be discharged. Judgment is due to be entered in favor of Debtor and against Plaintiffs on Plaintiffs' Complaint.

### Attorneys' Fees and Costs

The parties request awards of the attorneys' fees and costs they incurred during Bankruptcy Court and State Court proceedings. Plaintiffs' Complaint contains a request

for an award of reasonable attorneys' fees, costs, and interest pursuant to Fla. Stat. Section 772.11. Plaintiffs delineated in their Affidavit they have incurred attorneys' fees of $108,386.50 in connection with Bankruptcy Court and Florida State Court proceedings. No costs are set forth in their Affidavit.

The Debtor's Answer contains a Counterclaim in which she requests an award of reasonable attorneys' fees and costs. She delineated in her Affidavit she has incurred fees of $43,880.00 and costs of $3,166.36 in connection with Bankruptcy Court and Florida State Court proceedings. Debtor pled no legal basis for her Counterclaim.

*Fla. Stat. § 772.11:* Section 772.11 provides for an award of reasonable attorney's fees and costs where a person establishes by clear and convincing evidence he has been injured by a violation of certain provisions of Chapter 812 of the Florida Statutes, which pertain to theft, robbery, and related crimes, and exploitation of an elderly person or disabled adult. Plaintiffs did not plead or establish Debtor committed any such violation of the Florida Statutes. Section 772.11 is inapplicable to this proceeding.

*11 U.S.C. § 523(d):* Section 523(d) of the Bankruptcy Code provides for the recovery by a debtor of reasonable attorney's fees and costs where a consumer debt is adjudicated to be dischargeable. The debts at issue were not incurred primarily for a personal, family, or household purpose. They constitute business, not consumer, debts. Debtor is not entitled to fees and costs pursuant to 11 U.S.C. Section 523(d).

*Fla. Stat. § 57.105(7):* Section 57.105(7) of the Florida Statutes allows for the recovery of fees and costs by a prevailing party where there is an enforceable contract containing a fee award provision. Section 57.105(7) is applicable to this proceeding because: (i) the Nominee Agreement is a valid, enforceable contract; (ii) it contains a fee

14

award provision; and (iii) this adversary proceeding is, in part, an action to enforce the Nominee Agreement. Debtor is entitled to reasonable attorney's fees and costs pursuant to the Nominee Agreement and Fla. Stat. Section 57.105(7).

### *Interest*

Plaintiffs request an award of "interest" without definition or specification as to the legal basis for such request, its calculation, or amount. Plaintiffs have established no basis for an award of interest and their request is due to be denied.

## CONCLUSIONS OF LAW

The party objecting to the dischargeability of a debt carries the burden of proof and the standard of proof is preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991). Exceptions to discharge "should be strictly construed against the creditor and liberally in favor of the debtor." Schweig v. Hunter (In re Hunter), 780 F.2d 1577, 1579 (11th Cir. 1986).

### *11 U.S.C. § 523(a)(2)(A)*

Plaintiffs contend the $67,000.00 BTB Loan debt and the $332,211.61 debt from the Lake County Venture should be excepted from discharge pursuant to 11 U.S.C. Section 523(a)(2)(A), which provides a discharge pursuant to 11 U.S.C. Section 1328(b) does not discharge an individual from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—"

> false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

Plaintiffs must establish the traditional elements of common law fraud to prevail in a Section 523(a)(2)(A) action. <u>SEC v. Bilzerian (In re Bilzerian)</u>, 153 F.3d 1278, 1281 (11th Cir. 1998). Plaintiffs must establish: (1) Debtor made a false representation with the purpose and intent to deceive Plaintiffs; (2) Plaintiffs relied on the misrepresentation; (3) the reliance was justified; and (4) Plaintiff sustained a loss as a result of the misrepresentation. <u>Id.</u> at 1281; <u>Fuller v. Johannessen (In re Johannessen)</u>, 76 F.3d 347, 350 (11th Cir. 1996). They must establish each of the four common law fraud elements by a preponderance of the evidence. <u>Grogan</u>, 498 U.S. at 291; <u>In re Wiggins</u>, 250 B.R. 131, 134 (Bankr. M.D. Fla. 2000).

The cornerstone element in a Section 523(a)(2)(A) nondischargeability proceeding is a misrepresentation made with the intent to deceive the creditor. A creditor cannot establish non-dischargeability pursuant to Section 523(a)(2)(A) without proof of reliance on intentional misstatements by the debtor. <u>City Bank & Trust Co. v. Vann (In re Vann)</u>, 67 F.3d 277, 280 (11th Cir. 1995). A determination of fraudulent intent is an issue of fact and "depends largely upon an assessment of the credibility and demeanor of the debtor . . . ." <u>Equitable Bank v. Miller (In re Miller)</u>, 39 F.3d 301, 305 (11th Cir. 1994). Intent is a subjective issue and a review of the totality of the circumstances is relevant in determining a debtor's intent. <u>Id.</u>

The creditor's reliance upon the debtor's false representation must be justified. <u>Field v. Mans</u>, 516 U.S. 59, 73-75 (1995); <u>In re Vann</u>, 67 F.3d at 283-84. A plaintiff must establish a causal link between the debtor's misrepresentation and the resulting loss sustained by the plaintiff. <u>Lightner v. Lohn</u>, 274 B.R. 545, 550 (M.D. Fla. 2002).

16

Plaintiffs have not established the required elements for non-dischargeability pursuant to Section 523(a)(2)(A) as to the $67,000.00 BTB Loan and the Lake County Venture advances. Plaintiffs have not established by a preponderance of the evidence Debtor made any material misrepresentations to Plaintiffs with the intent to deceive them at the time Kaplus made the BTB Loan on March 15, 2006 or at the time the Lake County Venture advances were made.

Debtor believed, before Kaplus wired Debtor the $67,000.00.00: 1) BTB would guarantee pre-existing third-party buyers purchase the BTB Houses within thirty days of closing, which would generate between $250,000.00 and $350,000.00 in total net profit; and 2) Kaplus would be repaid the BTB Loan. When Kaplus demanded a refund of the $67,000.00, Debtor believed: (i) she could promptly obtain the funds by requesting a refund from BTB; and (ii) after BTB failed to return the funds, she could promptly refund the monies through involvement in the BTB venture or the sale of her residential condominium. She intended to refund the funds to Kaplus. She communicated her intentions to Kaplus.

Plaintiffs have not established Debtor's beliefs were otherwise. This is supported by Debtor's testimony as to the beliefs she held when she made the various representations, as well as the fact Debtor personally incurred mortgage debts to purchase the BTB Houses and Lake County Houses. Debtor personally risked losing her investments in the BTB venture and the Lake County Venture based on her belief her various optimistic representations were accurate.

Plaintiffs, by failing to establish the first nondischargeability element, failed to establish the second, third, and fourth elements. Plaintiffs have not established the BTB

17

Loan debt, the Lake County Venture debt, or any portion of these debts is nondischargeable pursuant to 11 U.S.C. Section 523(a)(2)(A).

### 11 U.S.C. Section 523(a)(4)

Plaintiffs challenge the dischargeability of the BTB Loan debt and the Lake County Venture debt pursuant to 11 U.S.C. Section 524(a)(4), which provides a discharge pursuant to 11 U.S.C. Section 1328(b) does not discharge an individual from any debt resulting from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Plaintiffs' Complaint does not specify whether Debtor committed fraud or defalcation while acting in a fiduciary capacity, whether Debtor embezzled funds, and/or whether Debtor committed larceny.

Plaintiffs, to prevail in a nondischargeability action based on the first prong of Section 523(a)(4), must establish by a preponderance of the evidence: (1) Debtor was acting in a fiduciary capacity; and (2) while acting in a fiduciary capacity, she committed fraud or defalcation. In re Goodwin, 355 B.R. 337, 343 (Bankr. M.D. Fla. 2006). The fiduciary relationship must exist at the time the act creating the debt was committed. Guerra v. Fernandez-Rocha (In re Fernandez-Rocha), 451 F.3d 813, 817 (11th Cir. 2006).

"Although the definition of 'fiduciary' under §523(a)(4) is a matter of federal law, the court must consult applicable state law in determining whether the type of trust relationship contemplated by §523(a)(4) exists." In re Cramer, 93 B.R. 764, 767 (Bankr. M.D. Fla. 1988).

A Florida "partnership" is created where "both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business." Williams v. Obstfeld, 314 F.3d

1270, 1275 (11th Cir. 2002) (*citing* <u>Dreyfuss v. Dreyfuss</u>, 701 So. 2d 437, 439 (Fla. 3d DCA 1997). A joint venture "is a partnership of limited scope ordinarily terminating when the objects of its creation have been accomplished." <u>Kislak v. Kreedian</u>, 95 So. 2d 510, 514 (Fla. 1957). Partnerships and joint ventures are governed by the same rules of law. <u>Id.</u>

The parties' communications and conduct establish Kaplus and Debtor were partners as to the BTB venture; and Kaplus, Debtor, and HBRU were partners as to the Lake County Venture.

Joint venturers owe to each other "the duty of the finest and highest loyalty." <u>Donohue v. Davis</u>, 68 So. 2d 163, 171 (Fla. 1953). An extraordinary level of fiduciary duty must be present for a debt to be nondischargeable pursuant to Section 523(a)(4), however. <u>Bar-Am v. Grosman</u>, (<u>In re Grosman</u>), No. 6:05-ap-328-KSJ, 2007 WL 1526701, at *16 (Bankr. M.D. Fla. May 22, 2007). When referring to provisions of "the various bankruptcy statutes in effect since 1841 . . . [t]he Supreme Court has consistently held that the term 'fiduciary' is not to be construed expansively, but instead is intended to refer to 'technical trusts.'" <u>Quaif v. Johnson</u>, 4 F.3d 950, 953 (11th Cir. 1993) (*citing* <u>Chapman v. Forsyth</u>, 43 U.S. 202 (1844); <u>Upshur v. Briscoe</u>, 138 U.S. 365 (1891); and <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328 (1934)).

The existence of an express or technical trust is required for a fiduciary relationship pursuant to Section 523(a)(4). <u>In re Cuenant</u>, 339 B.R. 262, 274 (Bankr. M.D. Fla. 2006). An express or technical trust exists when "there is: (1) a segregated trust res; (2) an identifiable beneficiary, (3) and affirmative trust duties established by contract or statute." <u>Id.</u>

Debtor's duties, as a partner of Plaintiffs, do not constitute the level of fiduciary duty required by 11 U.S.C. Section 524(a).  Plaintiffs were required to establish the existence of an express or technical trust.  Id.  Plaintiffs did not establish the existence of a segregated trust res, an identifiable beneficiary, or affirmative trust duties established by contract or by statute.  Plaintiffs thus failed to establish the first prong of Section 523(a)(4).

Embezzlement is defined as "'the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'"  In re Kelley, 84 B.R. 225, 231 (Bankr. M.D. Fla. 1988) (citation omitted).  Plaintiffs must establish fraudulent intent to prevail pursuant to the second prong of Section 523(a)(4).  Id.  Proof of a fiduciary relationship is not necessary.  General Elec. Capital Corp. v. Pickett (In re Picket), 150 B.R. 812, 814 (Bankr. M.D. Fla. 1992).

Larceny constitutes the fraudulent taking of another's property with the intent to convert it without the other's consent.  In re Pupello, 281 B.R. 763, 768 (Bankr. M.D. Fla. 2002).  Larceny differs from embezzlement in that the original taking of the property must be unlawful.  Id.

Plaintiffs have not established by a preponderance of the evidence Debtor took any of their property, entrusted to her or otherwise, with fraudulent intent or with intent to convert such property.  Plaintiffs have not established the BTB Loan debt, the Lake County Venture debt, or any portion of these debts is nondischargeable pursuant to 11 U.S.C. Section 523(a)(4).

Any and all debts owed by Debtor to Plaintiffs relating to the BTB Loan and Lake County Venture are dischargeable and are due to be discharged.

### *Attorneys' Fees and Costs*

A litigant may recover attorney's fees and costs only where such an award is provided for by statute or enforceable contract. <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 257 (1975).

***Plaintiffs' Request:*** Section 772.11 provides for an award of reasonable attorney's fees and costs and treble damages where a person establishes by clear and convincing evidence he has been injured by a violation of Florida's omnibus theft, robbery, and related crimes statutes found at Fla. Stat. Sections 812.012 through 812.037, or Section 825.103(1) of Chapter 812 of the Florida Statutes. A defendant is entitled to an award of fees and cost if the plaintiff "raised a claim that was without substantial fact or legal support." FLA. STAT. § 772.11(1).

Plaintiffs did not plead or prosecute a theft, robbery, or exploitation cause of action against the Debtor pursuant to Chapter 812 of the Florida Statutes. Section 772.11 is inapplicable to this proceeding and provides no statutory basis for an award of fees and costs to either Plaintiffs or Debtor.

***11 U.S.C. § 523(d):*** Section 523(d) provides for a prevailing debtor in a nondischargeability action to recover her fees and costs where the debt at issue is a "consumer debt" and the creditor's position was not "substantially justified." 11 U.S.C. § 523(d). The debts owed by Debtor to Plaintiffs constitute business debts and not consumer debts, as defined by 11 U.S.C. Section 101(8). Debtor is not entitled to a recovery of fees and costs pursuant to 11 U.S.C. Section 523(d).

*Nominee Agreement and Fla. Stat. § 57.105(7):*   Contractual and statutory grounds exist for an award of attorneys' fees and costs to Debtor. The parties intended for the Nominee Agreement to be binding as established by their conduct and the plain, unambiguous language of the Nominee Agreement. Plaintiffs, pursuant to their attempts to enforce the Nominee Agreement, are estopped from challenging the validity or enforceability of that document.

The Nominee Agreement, pursuant to Paragraph 11, is governed by Florida State law. The plain language of the Nominee Agreement is unambiguous and is controlling. Rose v. M/V "Gulf Stream Falcon", 186 F.3d 1345, 1350 (11th Cir. 1999) ("It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls."). All of the essential elements required for an enforceable contract pursuant to Florida State law are present: (i) there was an offer; (ii) acceptance; (iii) sufficient consideration; (iv) the parties had a meeting of the minds; and (v) the parties had capacity to contract. Matter of T&B Gen. Contracting, Inc., 833 F.2d 1455, 1459 (11th Cir. 1987); Lockheed Martin Corp. v. Galaxis USA, Ltd., 222 F. Supp.2d 1314, 1323 (M.D. Fla. 2001).

The effectiveness or enforceability of the Nominee Agreement was not contingent on the parties' execution of an operating agreement or any other event or condition precedent.   Their intent to execute an operating agreement does not affect the enforceability of the Nominee Agreement. John I. Moss, Inc. v. Cobbs Co., Inc., 198 So. 2d 872, 874 (Fla. 3d DCA 1967) ("The rule that it is possible for parties to make an enforceable contract binding them to prepare and execute a subsequent agreement is well recognized.").

The Nominee Agreement constitutes a valid, enforceable contract pursuant to Florida State law. This adversary proceeding is, in part, an action to enforce the terms of the Nominee Agreement.

Section 57.105(7) of the Florida Statutes provides:

> (7) If a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract. This subsection applies to any contract entered into on or after October 1, 1988.

FLA. STAT. § 57.105(7) (2003). Section 57.105(7) is applicable in dischargeability actions and "safeguards a debtor's fresh start." In re Woollacott, 211 B.R. 83, 87 (Bankr. M.D. Fla. 1997).[28]

Section 57.105(7) is applicable to this proceeding. Debtor is entitled to an award of reasonable attorney's fees and costs pursuant to the Nominee Agreement and Fla. Stat. Section 57.105(7). Plaintiffs shall be granted an opportunity to file a response to the Debtor's Affidavit.

### *Interest*

Plaintiffs request an award of "interest" without further specification as to the legal basis for such request, its calculation, or amount. Plaintiffs have established no basis for an award of interest.

### *Conclusion*

Judgment is due to be entered in favor of Debtor and against Plaintiffs on Plaintiffs' Complaint.

---

[28] Florida Statute Section 57.105(7) was formerly Section 57.105(2) and was renumbered by the 2003 legislative amendments.

Accordingly, it is

**ORDERED, ADJUDGED and DECREED** that debts owed by Debtor to Plaintiffs are **DISCHARGEABLE** pursuant to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(4) and are due to be discharged if and when a discharge is granted to Debtor pursuant to Title 11 of the United States Code; and it is further

**ORDERED, ADJUDGED and DECREED** the Plaintiffs' request for an award of attorneys' fees, costs, and interest is hereby **DENIED**; and it is further

**ORDERED, ADJUDGED and DECREED** that Debtor is entitled to an award of reasonable attorneys' fees and costs pursuant to the Nominee Agreement and Fla. Stat. Section 57.105(7); and it is further

**ORDERED, ADJUDGED and DECREED** that Plaintiffs may file and serve on Debtor any response to the Debtor's Affidavit (Doc. No. 30) within fourteen (14) days from the entry of this Memorandum Opinion and Order.

A separate Judgment consistent with these Findings of Fact and Conclusions of Law shall be entered contemporaneously.

Dated this 22nd day of July, 2010.

ARTHUR B. BRISKMAN
United States Bankruptcy Judge